# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **TONY A. MESSER, ET AL.,** | ) | |
| | ) | |
| Plaintiffs, | ) | **OPINION AND ORDER** |
| | ) | |
| v. | ) | Case No. 1:18CV00040 |
| | ) | |
| **BRISTOL COMPRESSORS** | ) | By: James P. Jones |
| **INTERNATIONAL, LLC, ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Mary Lynn Tate, Tate Law PC, Abingdon, Virginia, for Plaintiffs; W. Bradford Stallard, Penn, Stuart & Eskridge, Abingdon, Virginia, and Alexander A. Ayar, McDonald Hopkins, Bloomfield Hills, Michigan, for Defendant Bristol Compressors International, LLC; Mark H. Churchill and Kevin M. D'Olivo, Holland & Knight LLP, Tysons, Virginia, for Defendant Garrison Investment Group, LP.*

In this class action alleging violations of the federal Worker Adjustment and Retraining Notification ("WARN") Act, the defendants have filed five separate motions for partial summary judgment. The motions have been fully briefed and are here resolved.

## I.

This action was brought by forty-eight individual plaintiffs for themselves and on behalf of all former employees of Bristol Compressors International, LLC ("Bristol") who were terminated as a result of a plant closure. The plaintiffs contend

that the defendants[1] did not comply with the WARN Act, which requires certain employers who occasion a plant closing or mass layoff to provide each employee who suffers an employment loss sixty days' advance written notice. 29 U.S.C. § 2102; *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 545–46 (1996). Employers who violate the WARN Act are liable to each affected employee for certain specified damages.

On April 4, 2019, the plaintiffs filed a motion to certify a class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3). The court granted the motion and certified a class with three subclasses. Op. & Order, June 20, 2019, ECF No. 32. Prior to this certification, the defendants filed the first motion for summary judgment seeking partial summary judgment. ECF No. 28. Thereafter, while the court had under advisement the plaintiffs' motions for approval of subclass representatives and a class notice, the defendants filed four additional motions for partial summary judgment. ECF Nos. 61, 63, 65, 67. The court thereafter denied a motion by the plaintiffs to file an amended complaint and directed that the pending motions for summary judgment be determined prior to notice to the potential class members. Order, Jan. 31, 2020, ECF No. 97.[2]

---

[1] In addition to defendant Bristol, its parent company, Garrison Investment Group, LP ("Garrison"), is a defendant.

[2] Because notice to the class has not been provided, my rulings bind only the named plaintiffs and not the non-plaintiff class members, although of course the rulings may have

Prior to July 31, 2018, defendant Bristol employed between 450 and 500 people at a hermetic compressor manufacturing facility in Bristol, Virginia. On July 31, Bristol sent letters to all employees, informing them that the company would permanently close on or around August 31, 2018, and that layoffs would begin immediately and continue through August. The first wave of terminations took place between July 31 and August 2, 2018. Between 50 and 110 employees were terminated during this first wave of terminations.

Thereafter, additional details about the factory closing were provided to the remaining employees in a memorandum that informed them that their last day of employment would be on or before September 30, 2018. It also stated that Bristol had terminated some employee benefits, including severance pay.

Bristol also sent a memorandum to employees offering them a bonus for working throughout the company's wind-down process. Terminations continued throughout September and November, and the facility closed on or about November 16, 2018. Ultimately, to receive a bonus for working through the wind-down process, employees were required to execute an agreement that released all claims

---

law-of-the-case effect. *See Faber v. Ciox Health, LLC*, 944 F.3d 593, 602–04 (6th Cir. 2019).

related to their employment, including an express waiver of all WARN Act claims and the right to join the present lawsuit.

## II.

The court is required to grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). In considering the facts, I must view them in the light most favorable to the non-movant. *Small v. WellDyne, Inc.*, 927 F.3d 169, 173 (4th Cir. 2019).

The five motions for partial summary judgment filed by the defendants are resolved as follows.

### A. Motion for Partial Summary Judgment as to Severance Plan (Docket No. 28).

The defendants contend that the employer properly terminated its severance plan before any employees were terminated and thus any claim for severance damages must be denied. The plaintiffs argue to the contrary.

Bristol's Employee Handbook contained a provision entitled Severance Pay.

That portion of the handbook stated:

### 7.5 <u>SEVERANCE PAY</u>

In the event you are laid off, you may be entitled to receive severance pay provided you have more than 90 days of continuous service as a Regular Employee at the time of the layoff. All severance payments will be based on your straight time rate for a 40-hour week, excluding shift premium, if applicable. Severance pay will be calculated (using full years of service) as described in the following schedule:

<u>SEVERANCE PAY SCHEDULE</u>

| <u>Credited Service</u> | <u>Number of Hours Received</u> |
|---|---|
| Less than 3 months | -0- |
| 3 Months, but less than 1 Year | 40[3] |
| 1 year, but less than 5 Years | 80 |
| 5 Years | 100 |
| 6 Years | 120 |
| 7 Years | 140 |
| 8 Years | 160 |
| 9 Years | 180 |
| 10 Years | 200 |
| 11 Years | 220 |
| 12 Years | 240 |
| 13 Years | 260 |
| 14 Years | 280 |
| 15 Years | 300 |
| 16 Years | 320 |
| Over 16 Years | 340 |

Severance pay is not applicable or ceases when any of the following situations occur:
1. Voluntary resignation.
2. Termination for cause.
3. Recall from layoff.

---

[3] An Addendum to the handbook effective January 4, 2016, eliminated severance pay for employees who had worked for Bristol for less than one year.

4. Approved leaves of absence.
5. Retirement.
6. If a comparable position is offered and refused during a workforce reduction.

Mem. Law Supp. Defs.' Joint Mot. Partial Summ. J., Edgecomb Decl. Ex. A, 39–40, ECF No. 28-2.

Another section of the handbook states, "Nothing in this handbook is meant to create an employment contract and nothing in this handbook may be modified or amended except in writing by the Human Resources department. The Company reserves the right to modify, change, or eliminate provisions in this handbook." *Id.* at 7. The handbook later states, "The Company may change the provisions of this Handbook at any time and the programs and policies outlined in this Handbook are not contractual in nature." *Id.* at 56.

On July 27, 2018, Bristol's Board of Directors adopted a resolution entitled "UNANINMOUS [sic] WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF BRISTOL COMPRESSORS INTERNATIONAL, LLC." *Id.* at Ex. B at 1, ECF No. 28-2. The resolution reads:

> The undersigned, being all of the members of the Board of Directors (collectively, the "Board") of Bristol Compressors International, LLC, a Delaware limited liability company (the "Company"), by written consent in accordance with the terms and conditions of the Amended and Restated Limited Liability Company Agreement of Bristol Compressors International LLC and the Delaware Limited Liability Company Act, hereby consent to the following actions and adopt the following resolutions, effective as of July 27, 2018 (the "Effective Date"):

**WHEREAS,** the Company faces serious financial difficulties due to various factors, which have resulted in significant cash flow issues that are negatively impacting the Company's business operations;

**WHEREAS,** the Board has met with the [*sic*] Dalton Edgecomb, the Company's Chief Restructuring Officer, and the Company's legal counsel, McDonald Hopkins LLC, to review and discuss a wind down and liquidation plan presented to the board by Mr. Edgecomb;

**WHEREAS,** after discussions and due consideration, the Board has unanimously determined that it is in the best interests of the Company and its creditors would be best served by commencing an orderly wind down and liquidation on July 30, 2018;

**WHEREAS,** after further discussions and due consideration, the Board has unanimously determined that it is in the best interests of the Company and its creditors to terminate the Company's severance plan as described in Section 7.5 of the Company's employee handbook, effective as of July 27, 2018, and to delete the corresponding provisions in Section 7.5 of the Company's employee handbook effective as of July 27, 2018; and

**WHEREAS,** the Board has determined that it is in the best interests of the Company to authorize and empower Mr. Edgecomb (the "Authorized Person") to take such actions on behalf of the Company as he deems necessary or desirable in connection with winding down and liquidating the Company and the termination of the Company's severance plan;

**NOW, THEREFORE, BE IT RESOLVED,** that the Board unanimously approves of and authorizes the orderly wind down and liquidation of Company, commencing on July 30, 2018.

**FURTHER RESOLVED,** that the Board unanimously approves of and authorizes the termination of the

Company's severance plan as described in Section 7.5 of the Company's employee handbook, effective as of July 27, 2018, and the deletion of the corresponding provisions in Section 7.5 of the Company's employee handbook effective as of July 27, 2018.

**FURTHER RESOLVED,** that the Authorized Person is hereby authorized and empowered to take such actions as may be necessary or advisable to execute, deliver, and file any documents and to take all actions and pay all fees for and on behalf of the Company that he deems necessary or appropriate in order to effectuate the wind down and liquidation of the Company and to effectuate the termination of the Company's severance plan and the corresponding revisions to the Company's employee handbook, and to comply with all applicable laws in connection therewith.

**FURTHER RESOLVED,** that all lawful acts and things heretofore done by any officers, employees, or agents of the Company, on or prior to the date as of which the foregoing resolutions were adopted by the Board, in connection with the matters contemplated by such resolutions be, and the same hereby are, in all respects ratified, confirmed, approved, and adopted as acts on behalf of the Company.

The actions taken by this Unanimous Written Consent shall have the same force and effect as if taken by the undersigned at a meeting of the Board, duly called and constituted pursuant to the laws of the State of Delaware. This Unanimous Written Consent may be executed in one or more counterparts, each of which shall be deemed to be an original for all purposes, and all of which together shall constitute a single instrument. Delivery by telecopier or other facsimile or electronic transmission shall constitute valid delivery hereof for all purposes.

*Id.* at 1-2. All five of Bristol's directors signed the resolution on July 31, 2018.

Dalton Edgecomb, Bristol's Chief Restructuring Officer, gave the following testimony in his deposition:

A. Yeah, the board voted to edit the employee handbook and to change the severance practices.

Q. Okay. And were you tasked with doing any of that? Was there something you were supposed to do to end the severance pay?

A. No. That would require the board. It would require a board resolution. So I just merely provided the information to the board.

Q. And do you know whether the board took action on it?

A. They did.

Q. And do you know what their action document or decision consisted of?

A. All I know is what was in the board resolution.

Q. Do you know if any other action was taken after the fact by staff with respect to the severance pay?

A. With regard to severance, no.

Reply Supp. Defs.' Joint Mot. for Partial Summ. J. as to Pls.' Demand for Severance Damages Under the WARN Act Ex. B, Edgecomb Dep. 88, ECF No. 102-2.

On July 31, 2018, Bristol notified employees that it planned to cease operations. It terminated some employees effective that day, and terminations continued over the next three and a half months.

On August 1, 2018, Bristol's Human Resources department distributed to employees and posted a questions-and-answers document regarding the plant closure. In relevant part, the document states:

**7. Will severance pay be paid out now that the company is closing?**

> The Company has terminated the severance plan and severance will not be paid out related to this plant closing.

Edgecomb Decl. Ex. C at 1, ECF No. 28-2.

In opposition to the defendants' motion, the plaintiffs submitted a declaration of Deborah Eades, who was Bristol's Human Resources Manager when she was terminated on October 19, 2018, as part of the plant closure. Eades states,

> As part of my work in this position I met with, reported to, and completed tasks assigned by the Bristol CEO, and Chairman of the Board as needed.
>
> I assisted in the preparation of severance pay calculations and documents for those employees who were laid off and also those who returned from layoffs. Bristol management made determinations regarding employees' entitlement to severance pay and whether there were causes for termination and disqualification from receiving severance pay. Our department then followed those instructions in preparing, processing payment and receipts and any other necessary documentation.

Decl. of Deborah Eades 2, ECF No. 100. Attached to her declaration are two examples of previous handbook amendments prepared by the Human Resources department "to implement changes decided and authorized by management." *Id.* at 3.

Eades asserts that she was unaware of any change to the severance plan until August 1, 2018, when Edgecomb gave her the questions-and-answers document and requested that she post and distribute it. No one asked her how amendments to the handbook were usually made, nor did anyone instruct her to prepare an amendment deleting the severance plan from the handbook.

The defendants argue that former employees cannot recover any damages based on the severance plan because the company's Board of Directors properly eliminated the severance plan effective July 27, 2018, several days before any employees were terminated. The plaintiffs counter that the severance plan was never actually terminated. Instead, according to the plaintiffs, the resolution adopted by the Board of Directors merely approved of the plan's deletion and authorized Edgecomb to take the steps necessary to effectuate the deletion. Because Edgecomb took no further steps and Human Resources did not produce an amendment to the handbook removing § 7.5, the plaintiffs argue that the severance plan remained in place and the employees' rights to severance benefits were vested when they were terminated.

As a threshold matter, the parties disagree about whether the severance plan is governed by the federal Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 (ERISA) or by Virginia contract law principles. Although the defendants contend that the severance plan is not an ERISA plan, they assert that resolution of this issue is not necessary to determination of the motion before the court. The plaintiffs disagree and argue that the severance plan is an ERISA plan.

A recently adopted regulation promulgated under ERISA expressly states that severance plans are included within the statute's definition of "welfare plan." 29 C.F.R. § 2510.3-1(a)(3). The Fourth Circuit has also held that "[a] plan established

by an employer providing for severance pay benefits is an employee welfare benefit plan covered by ERISA." *Biggers v. Wittek Indus., Inc.*, 4 F.3d 291, 295 (4th Cir. 1993). The defendants have not explained the basis for their contention that the severance plan contained in the Employee Handbook is not a welfare benefit plan under ERISA. I find that the severance plan is a welfare benefit plan and that ERISA and the regulations adopted and case law decided thereunder control my interpretation of the plan and the defendants' actions regarding the plan. "Insomuch as ERISA plans are contracts, summary judgment is appropriate provided there is no ambiguity in the contract or plan." *Ret. Comm. of DAK Ams. LLC v. Brewer*, 867 F.3d 471, 479 (4th Cir. 2017).

"[B]ecause a welfare benefit plan is not subject to ERISA's vesting provisions, an employer is free to amend the terms of the plan or terminate it entirely." *Biggers*, 4 F.3d at 295. The plaintiffs do not dispute this principle. Their sole argument is that Bristol did not, in fact, eliminate the plan before commencing terminations. According to the plaintiffs, the board's resolution merely authorized Edgecomb to take the further steps necessary to eliminate the plan, namely, having the Human Resources department prepare and post an amendment to the Employee Handbook.

The Employee Handbook, which contains the severance plan, provides that only the Company can modify or eliminate portions of the Employee Handbook.

Edgecomb Decl. Ex. A at 7, 56, ECF No. 28-2. The Supreme Court considered a similar clause in *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80 (1995). The Court explained that "to identify 'the Company' as the person with amendment authority is to say, in effect, that the procedure for identifying the person with amendment authority is to always look to 'the Company'" and not to any other person. *Id.* (alterations omitted). "[P]rinciples of corporate law provide a ready-made set of rules for determining, in whatever context, who has authority to make decisions on behalf of a company." *Id.*

Bristol's Board of Directors was the ultimate decision-maker for Bristol pursuant to the governing Amended and Restated Limited Liability Company Agreement of Bristol Compressors International, LLC. The company acted through its board, which duly voted to eliminate the severance plan on July 27, 2018. The provision of the handbook regarding amendments prepared by the Human Resources department was merely an administrative procedure designed to communicate changes to employees. The Human Resources department did not have the power to amend the handbook's policies on its own; it could only implement or communicate policies already adopted or eliminated by the board.

The plain language of the board resolution indicates that the board believed that the severance plan would be eliminated upon the resolution's execution by the board members. The resolution itself states that the elimination was effective on the

very day that the resolution was executed. Edgecomb testified that no further action was required beyond the board's adoption of the resolution.

I conclude that the undisputed facts show that Bristol eliminated its severance plan, as it had the power to do, before terminating any of the employees and no benefits under the plan had vested at the time of the plan's elimination. Therefore, none of the plaintiffs may recover any benefits under the severance plan, and the defendants are entitled to summary judgment on this issue.

### B. Motion for Partial Summary Judgment as to Release of Claims (Docket No. 61).

The defendants contend that they are entitled to summary judgment as to claims of employees who executed agreements releasing their claims in this action. The plaintiffs contend that the releases are unconscionable and otherwise unenforceable.

Bristol notified its employees on July 31, 2018, that it intended to cease operations and terminate all employees by August 31, 2018. While some employees were terminated between July 31 and August 31, Bristol was ultimately able to secure enough final orders from its customers to continue operating until mid-November 2018.

Edgecomb, Bristol's Chief Restructuring Officer, on August 14, 2018, sent a letter to Bristol's remaining hourly employees that stated:

Bristol Compressors International, LLC values your contributions to the company and would like to ensure the continuation of your employment through the company's wind down process. In order to incentivize you to continue your contributions to Bristol, the company will provide you with a stay bonus in the amount of $1,000 per person.

In order to receive the stay bonus payment, you must continue to perform the duties assigned to you and meet performance expectations set forth by management. Payment of the stay bonus will be paid out at the time of termination and will be included in your final pay check according to the normal payroll schedule. Should you elect to resign prior to being notified of your termination, this bonus will be forfeited.

In addition to the stay bonus, Bristol Compressors International, LLC is also offering a bonus pool of $265,000 to be distributed equally to all _remaining_ hourly employees that meet the quality and productivity objectives below, set my [*sic*] management.

Quality – 6,300 PPM – based on last 12-month average

Productivity per day (to be determined by August 21, 2018 and may vary depending on part supplier availability).

In order to receive the bonus pool payment, you must (i) achieve the performance objectives for quality and productivity as defined, and (ii) continue to perform the duties assigned to you and meet performance expectations set forth by management.

You must be present at the time of the plant closure to receive the bonus pool payment. Payment will be included in your final pay check according to the normal payroll schedule or as administratively possible. Should you elect to resign prior to plant closure, this bonus will be forfeited.

Mem. Supp. Defs.' Joint Mot. for Partial Summ. J., Edgecomb Decl. Ex. A, ECF

No. 62-2.

On August 8, 2018, and August 14, 2018, Bristol sent its remaining salaried employees letters offering each of them stay bonuses in varying amounts. In order to receive a stay bonus, an hourly employee was required to sign the letter and continue to perform assigned duties and to meet performance expectations. These letters are not included in the summary judgment record.

In support of Bristol's Motion for Summary Judgment, Edgecomb declares, "Bristol's hourly employees failed to meet the quality and productivity goals specified in the August 14, 2018 memorandum. That failing was made known to all impacted hourly employees." *Id*. at Edgecomb Decl. ¶ 11, ECF No. 62-1. The record regarding this motion contains no further evidence in support of this statement.

Hourly employees terminated after August 31, 2018, were nevertheless each offered total stay bonuses of $2,300. The stay bonus offers were made after the employees were terminated. In order to receive these stay bonuses, each hourly employee was required to execute a Stay Bonus Letter Agreement ("SBLA"). The SBLA included a release of claims against Bristol, including a waiver of WARN Act claims and a specific waiver of the right to participate in the instant lawsuit. Of the hourly employees who received such an offer, 218 signed the SBLA and received the $2,300 bonus. The hourly employees' SBLA states:

> Bristol Compressors International, LLC (the "Company") has appreciated your continued service as we wind down our operations.

This letter agreement ("Agreement") states the terms for receiving the stay bonus. The stay incentive is **$2,300** ("Stay Bonus") less any withholdings and deductions authorized or required by law. **To receive the Stay Bonus, you must sign this Agreement and return it between November 16, 2018 and November 23, 2018[4]. An Agreement returned before November 16, 2018 will not be accepted.**

1. The Company will pay you the Stay Bonus specified above in one lump sum, less withholdings and deductions, within thirty (30) business days after you return a signed copy of this Agreement and if you meet the conditions specified in this Agreement on the Closing Date. This payment may be attributable to pay in lieu of notice under the WARN Act. The payment of the Stay Bonus is conditioned upon:

a. You must be actively employed by the Company on the date that the Company specifies as the last date of employment ("Closing Date"). If your at-will employment ends for any reason prior to the Closing Date, if you have provided notice that employment will end prior to the Closing Date, or if you are unable to fulfill your job duties in any material way through the Closing Date, you will forfeit any eligibility for or right to the Stay Bonus.

2. The Stay Bonus is consideration that is not otherwise due or owing to you except as the result of this Agreement. You agree in return for this consideration to release the Company and Garrison Investment Group, LP and each of their respective officers, representatives, owners, agents, insurers, investors, funders, employees, subsidiaries, and related and affiliated entities (collectively the "Released Parties") from any and all causes of action, claims, damages, attorney fees, and any other liabilities or claims of any kind, whether in law or in equity, known or unknown, that you have, may have, or may have had against any of the Released Parties. Your release is a general release, extinguishes any claims, and precludes any litigation, or damages by you against the Released Parties based on anything that occurred on or before the date on which you sign this Agreement, and is effective to the fullest extent permitted by law. This

---

[4] These dates vary by employee based on each employee's date of termination.

means that you give up any right to file any claims against the Released Parties under any and all applicable state or federal statutes, and under the common law, including but not limited to any claims against the Released Parties about anything relating to your employment or the end of your employment under any applicable state or federal statutes, including but not limited to Title VI of the Civil Rights Act, the Worker Adjustment and Retraining Notification Act, and the Virginia Human Rights Act, and under the common law. This release also means that you release and forever discharge any claims alleged in and the right or ability to participate in a lawsuit currently pending in federal court entitled, *Tony Messer, et al. v. Bristol Compressors International, LLC, et. al.* Case #1:18-cv-00040-JPJ-PMS. This Agreement does not preclude a federal or state agency civil rights charge, but does include a release of the right to file a lawsuit or to seek or receive individual remedies or damages in any state or federal-filed court action. You acknowledge and affirm that you are not aware of any claims that you have not disclosed.

The only claims and causes of action that you is [*sic*] not waiving, releasing, and discharging are for the consideration that you will receive under this Agreement, any vested benefits to which you may be entitled under the Company's written benefit plans, and any claims that, as a matter of law, cannot be waived, released, and discharged.

3. This Agreement states the parties' entire agreement and supersedes any and all prior agreements and communications, whether oral or written, relating to the stay bonus or the end of the employment relationship with the Company. This agreement may only be modified by a written agreement signed by you and an authorized Company official. While this Agreement resolves any and all disputed claims, the Company denies any and all liability to any violations of the law or breach of any contracts.

4. This Agreement's validity and interpretation shall, in all respects, be governed by the relevant laws of the Commonwealth of Virginia. The invalidity or unenforceability of any Agreement provisions does not affect any other provision.

*Id*. at Ex. B, ECF No. 62-3.

Remaining salaried employees received a similar form of the SBLA that offered differing amounts of money. Thirty-one salaried employees signed the SBLA. The salaried employees' SBLA states:

Bristol Compressors International, LLC (the "Company") has appreciated your continued service as we wind down our operations. This letter agreement ("Agreement") states the terms related to receipt of the stay bonus and an offer for additional consideration.

1. The Company will pay you the Stay Bonus in the amount of **$6,250**,[5] in a lump sum, less withholdings and deductions, if you meet the conditions specified in the August 8, 2018 letter on the Closing Date. The payment of the Stay Bonus is conditioned upon:

a. You must be actively employed by the Company on the date that the Company specifies as your last date of employment ("Closing Date"). If your at-will employment ends for any reason prior to the Closing Date, if you have provided notice that employment will end prior to the Closing Date, or if you are unable to fulfill your job duties in any material way through the Closing Date, you will forfeit any eligibility for or the right to the Stay Bonus.

2. In addition to the Stay Bonus, the Company is offering to provide additional consideration in return for your promises in this Agreement. If you sign this Agreement and return it between **November 10, 2018 and November 17, 2018**,[6] the Company will pay you an additional amount of **$187.50**,[5] less withholdings and deductions required by law. This payment is attributable to pay in lieu of notice under the WARN Act.

*Id.* at Ex. C, ECF No. 62-4. The remainder of the salaried employees' SBLA is identical to the hourly employees' SBLA. Edgecomb declares that for each of the

---

[5] The stated amount is different for each salaried employee.

[6] Different dates are listed for each employee.

salaried employees, the stay bonus amount stated in the SBLA was at least as large as the amount stated in the agreement they had previously executed in August. Like the hourly employees, each salaried employee was terminated prior to executing the SBLA. The salaried employees who executed the SBLA were paid the amounts stated therein.

Three of the named plaintiffs in this case were hourly employees who executed SBLAs. Those plaintiffs are Homer L. Davis, Gary Houser, and James E. Smith. Fifty-eight employees terminated after August 31, 2018, chose not to sign an SBLA. It is unclear from the record whether those employees received any bonus amount following their termination.

In opposition to the defendants' motion, the plaintiffs have submitted a declaration of Janice L. Booher. She was terminated as part of the plant closure on November 16, 2018. As stated in the August 14, 2018, letter to hourly employees, the proposed bonus pool had a base amount of $265,000. Booher declares that "Bristol told us that this base amount would be distributed to those who stayed even if the productivity/quality goals were not met." Pls.' Response Opp'n Defs.' Joint Mot. for Partial Summ. J. Ex. B, Booher Decl. 2, ECF No. 90-1. Booher further states that she "signed the Stay Bonus Letter Agreement because [she] understood it said Bristol met WARN Act and [her] family needed the money since [she] was unemployed." *Id.* Attached to her declaration are two documents she asserts were

posted at Bristol's plant to apprise employees of the then-current amount of the bonus pool. One of the notices indicates that as of the week of September 24, the pool value was $335,000 and the payout per employee was $1,187.94, based on 282 then-remaining employees. The other notice states that as of the week of October 22, the pool value was $347,000 and the payout per employee was $1,285.19, based on 270 then-remaining employees.

The plaintiffs have also submitted a sample WARN Act notice dated October 29, 2018. In relevant part, the notice states:

> The purpose of this letter is to provide notice of the facility's closure pursuant to the Worker Adjustment and Retraining Notification Act of 1988.
>
> The Company has been in the process of seeking capital which, if obtained, would have enabled it to avoid or postpone a closure and continue operations. Unfortunately, those efforts have been unsuccessful. As a result, the Company will now be forced to permanently close the facility and is providing as much notice as practicable of this closing, which will commence with permanent lay-offs beginning on November 5, 2018.

*Id.* at Ex. D.

The defendants argue that the SBLAs operate to bar the claims of the employees who executed them and accepted payment thereunder. The plaintiffs contend that the SBLAs are unenforceable because they are unconscionable and because the employees received inadequate consideration in exchange for releasing their claims against the defendants.

A defendant bears the burden of proof with respect to the affirmative defenses of waiver and release.  *See* Fed. R. Civ. P. 8(c)(1); *Masonite Corp. v. Norfolk & W. Ry. Co.*, 601 F.2d 724, 727 (4th Cir. 1979).  However, under Virginia law, a party seeking to invalidate a contract on grounds of unconscionability must prove that the contract is unconscionable by clear and convincing evidence.  *Allocca v. Allocca*, 478 S.E.2d 702, 705 (Va. Ct. App. 1996).  "Traditionally, for a contract to be unconscionable, it must have been 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'"  *Lee v. Fairfax Cty. Sch. Bd.*, 621 F. App'x 761, 762 (4th Cir. 2015) (unpublished) (quoting *Chaplain v. Chaplain*, 682 S.E.2d 108, 113 (Va. Ct. App. 2009)).  "In other words, the inequality must be so gross as to shock the conscience."  *Id.* (internal quotation marks, citation, and alternation omitted).

A release is unenforceable if there was no consideration given for it or if the amount paid was "a pittance in contrast to the claim released."  *Capital Inv'rs Co. v. Ex'rs of Morrison's Estate*, 584 F.2d 652, 656-57 (4th Cir. 1978).  "If inadequacy of price or inequality in value are the only indicia of unconscionability, the case must be extreme to justify equitable relief."  *Swift v. Frontier Airlines, Inc.*, 636 F. App'x 153, 156 (4th Cir. 2016) (unpublished) (citing *Smyth Bros.-McCleary-McClellan Co. v. Beresford*, 104 S.E. 371, 381-82 (Va. 1920)).

When a court considers whether a contract is unconscionable, adequacy of price or quality of value transferred in the contract is of

initial concern. If a gross disparity in the value exchanged exists then the court should consider whether oppressive influences affected the agreement to the extent that the process was unfair and the terms of the resulting agreement unconscionable.

*Drewry v. Drewry*, 383 S.E.2d 12, 18 (Va. Ct. App. 1989) (internal quotation marks and citation omitted). Additional factors that may render a contract unconscionable include "concealments, misrepresentations, undue advantage, oppression, or evidence of ignorance, weakness of mind, sickness, old age, incapacity or pecuniary necessities." *Swift*, 636 F. App'x at 156.

The defendants appear to concede that at the time of their termination, the remaining hourly employees were entitled to the $1,000 stay bonus set forth in the August 14 letter, and the remaining salaried employees were entitled to receive the amount that had been stated in each of their August stay bonus agreements. The defendants have not offered any evidence suggesting that any of the relevant employees failed to "continue to perform the duties assigned to [them] and meet performance expectations set forth by management." Edgecomb Decl. Ex. A, ECF No. 62-2. At least as to the hourly employees, the August 14 letter contains no other prerequisites for receiving the $1,000 stay bonuses. Therefore, plaintiff correctly states that the employees were owed stay bonuses in some amount following their terminations. The employees had already fully performed under the original August agreements, and they were entitled to receive the initially promised stay bonus

amounts without providing additional consideration in the form of executing releases.

For their execution of SBLAs, however, they received additional consideration. According to Edgecomb, the quality and productivity conditions for the bonus pool payments set forth in the August 14 letters were not met. The plaintiffs' only contrary evidence is Booher's vague statement that "Bristol told us that this base amount would be distributed to those who stayed even if the productivity/quality goals were not met." Booher Decl. Ex. B at 2, ECF No. 90-1. She does not indicate who made such a statement, when, in what form, or provide any further information that might allow me to determine whether the statement could have modified the previous written agreements. This lone statement in a declaration by one former employee does not meet the plaintiffs' burden of proving the SBLA's unconscionability by clear and convincing evidence. Plaintiffs have failed to create a genuine issue of material fact regarding whether the remaining hourly employees were entitled to the bonus pool payment.

Therefore, the hourly employees who executed SBLAs each received $1,300 in consideration for releasing their claims against the defendants, in addition to the $1,000 that each hourly employee had been promised in the August 14 letter. This additional $1,300 per employee was money that Bristol did not previously owe them. The plaintiffs argue that $1,300 was a woefully inadequate amount compared to

what they might have been entitled to recover under the WARN Act. But there are no guarantees in litigation. Hourly employees presented with the SBLA could reasonably have concluded that it was in their best interest to take the $1,300 that was being offered and would be paid in approximately a month, rather than waiting to see if they would recover anything through protracted litigation. On the record before me, I cannot conclude that no reasonable person would have accepted the offer set forth in the hourly employees' SBLA or that the agreements are so inequitable as to shock the conscience.

The additional consideration paid to salaried workers in exchange for their execution of releases was in many cases considerably less than $1,300 and quite small in comparison with their salaries. For at least some of these employees, the undisputed facts show a significant disparity in value. As the plaintiffs acknowledge, however, that alone is not enough to show unconscionability. I conclude that the plaintiffs have not met their burden of showing the kind of oppressive influences necessary to render the SBLAs unenforceable.

The plaintiffs argue that the SBLAs were contracts of adhesion and that the employees had no representation or opportunity to negotiate the terms. "While a court may take into consideration that a contract is one of adhesion in determining whether a contractual provision is unconscionable, such contracts are not

unconscionable per se." *PHC-Martinsville, Inc. v. Dennis*, No. 161019, 2017 WL

4053898, at *2 n.4 (Va. Sept. 14, 2017) (unpublished).

> Virginia does not always, or even usually, presume adhesive contracts
> to be unenforceable. Instead, Virginia adheres to the general rule that:
> "The use of a standard form contract between two parties of admittedly
> unequal bargaining power does not invalidate an otherwise valid
> contractual provision. To be invalid, the provision at issue must be
> unconscionable."

*Saturn Distribution Corp. v. Williams*, 905 F.2d 719, 726 (4th Cir. 1990) (quoting

*Webb v. R. Rowland & Co.,* 800 F.2d 803, 807 (8th Cir. 1986)).

Here, there is no evidence that the employees were dissuaded or prevented

from seeking the advice of counsel before executing the SBLAs. In fact, each SBLA

provided at least a seven-day window during which the employee could consider its

terms and consult a lawyer. A significant number of remaining employees chose not

to execute SBLAs, which severely undermines the plaintiffs' argument that the

employees had no meaningful choice but to sign. The plaintiffs do not argue that

any of the former employees executed the SBLA under coercion or duress, nor does

the record evidence show that any individual employee was of unsound mind,

suffering severe economic hardship, or otherwise signed the release under

circumstances rendering it unconscionable.

I conclude that the plaintiffs have failed to show by clear and convincing

evidence that the SBLAs are unconscionable or otherwise unenforceable. I find that

the defendants have established that claims contained in this action are barred by the

releases contained in the SBLAs. The defendants are therefore entitled to summary judgment as to the plaintiffs who signed the releases.

Subclass Two of the class certification encompasses employees who signed releases. As defined in the class certification order, Subclass Two consists of:

> All those persons employed at Bristol Compressors International, LLC's Bristol, Virginia, manufacturing facility full time and who were terminated without cause on their part after August 31, 2018, as part of, or as the reasonably foreseeable consequence of the plant closing ordered by Defendants on July 31, 2018, who signed a Stay Bonus Letter Agreement, and who do not file a timely request to opt out of the class.

Op. & Order 18–19, June 20, 2019, ECF No. 32. For the reasons stated, I will also amend the class certification to exclude employees who signed a Stay Bonus Letter Agreement and abolish Subclass Two.

### C. Motion for Partial Summary Judgment as to Notice of Closure (Docket No. 63).

On July 31, 2018, Bristol issued letters to its employees stating that it expected its Bristol, Virginia, facility to permanently close "by or about August 31, 2018." Mem. Supp. Defs.' Joint Mot. Partial Summ. J. Ex. A, ECF No. 64-2. Bristol's prediction, however, turned out to be overly pessimistic. It was able to secure enough final orders from its customers to continue operations well into November 2018. Four employees identified by the defendants, Deborah Eades, Kristen Haywood, Timothy Large, and Chris Robinson, were in fact terminated on October 19, 2018, more than sixty days after they received the July 31 notice and less than

sixty days after the date by which they were initially told their employment would end.  The record does not contain evidence showing that following the July 31 letter, the four employees received any subsequent letters from Bristol providing revised termination dates.  The defendants argue that because these four employees remained employed for more than sixty days after receiving the July 31 notice letter, they are not entitled to any damages under the WARN Act.

The four employees who are the subject of defendants' motion are not plaintiffs to this action, although they are putative members of Subclass Three as established in the class certification order.  Because notice has not been given to the class, I cannot, consistent with due process, at this time determine the validity of their entitlement to Warn Act remedies.  Accordingly, this Motion for Summary Judgment will be denied without prejudice.

> D. *Motion for Partial Summary Judgment as to Single Employer Theory (Docket No. 65) and Plaintiffs' Motion for Voluntary Dismissal of Defendant Garrison Investment Group, LP (Docket No. 86).*

Garrison has filed a Motion for Summary Judgment seeking a finding that it was not an employer of the plaintiffs under the single employer theory and that it therefore cannot be liable to the plaintiffs for any WARN Act violations.  After Garrison filed this Motion for Summary Judgment, the plaintiffs moved to voluntarily dismiss Garrison as a defendant.  Garrison opposes the Motion to Dismiss because dismissal would be without prejudice, and having litigated the

matter this far, it would prefer to obtain a final judgment on the merits in its favor. It argues that if the plaintiffs are permitted to voluntarily dismiss Garrison, such a dismissal should be with prejudice so that Garrison is not later required to relitigate issues on which it has already expended considerable resources.

"A plaintiff's motion under [Federal Rule of Civil Procedure] 41(a)(2) for dismissal without prejudice should not be denied absent substantial prejudice to the defendant." *Andes v. Versant Corp.*, 788 F.2d 1033, 1036 (4th Cir. 1986). Nonexclusive factors relevant to a district court's decision on a Rule 41(a)(2) motion include the opposing party's effort and expense in preparing for trial; excessive delay or lack of diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of the litigation, including whether a dispositive motion is pending. *Hobbs v. Kroger Co.*, No. 98-1831, 1999 WL 156045, at *1 (4th Cir. Mar. 23, 1999) (unpublished). In considering a motion for voluntary dismissal, the court "must focus primarily on protecting the interests of the defendant." *Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987). However, "[a] plaintiff's motion to voluntarily dismiss a claim should not be denied absent plain legal prejudice to the defendant." *Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.,* 275 F.3d 384, 388 (4th Cir. 2001). Prejudice does not arise from the prospect of a second lawsuit or the possibility that the plaintiff will gain a tactical advantage over the defendant in future litigation. *Davis,* 819 F.2d at 1273.

Although discovery in this case is complete and Garrison has participated in briefing five motions for partial summary judgment, I do not find that Garrison has shown sufficient legal prejudice to justify denying the plaintiffs' Motion to Dismiss. At present, no trial date has been set in this case, the previously scheduled bench trial having been continued due to no fault of the parties. Were the plaintiffs to assert claims against Garrison at a later date, it is unlikely that Garrison would incur significant additional expenses, as the record is already well-established, and the parties have fully briefed the issue of Garrison's potential liability under a single employer theory. I conclude that the factors to be considered under Rule 41(a)(2) weigh in favor of the plaintiff, and I will grant the Motion to Dismiss and dismiss Garrison without prejudice. Accordingly, I will deny Garrison's Motion for Summary Judgment as moot.

### E. Motion for Partial Summary Judgment as to Unexpected Business Circumstances and Faltering Company Exceptions (Docket No. 67).

The defendants' final Motion for Partial Summary Judgment pertains to the WARN Act's exceptions to the sixty-day notice requirement in cases of unexpected business circumstances and faltering companies. In support of this motion, the defendants have put forth evidence tending to show the following facts.

In April 2017, Bristol began working to design a new motor for hermetic compressors, referred to as the DHX Technology, that would result in improved

energy efficiency ratings. The DHX Technology appeared promising, and there was a great deal of interest in it among Bristol's customers.

Since July 2012, Bristol had been a party to a credit agreement with Wells Fargo Bank ("Wells Fargo") under which Wells Fargo loaned money to Bristol on a revolving basis up to a borrowing base amount that was calculated based on Bristol's assets, including accounts receivable. On May 2, 2018, Bristol's customer AWAL Gulf Manufacturing Co., B.S.C. ("AWAL") told Bristol that it would not be able to timely pay $1.9 million that it owed to Bristol. Because AWAL was in default on its own debts, it had been restricted to spending cash only on payroll. The $1.9 million was then removed from the assets against which Bristol could borrow from Wells Fargo. As a result, on May 16, 2018, Wells Fargo notified Bristol that it considered Bristol to be in default under the credit agreement, demanded immediate repayment of the amount borrowed in excess of the lowered borrowing base, and would not commit to making future loans to Bristol.

Johnson Controls, Inc. ("JCI") was Bristol's largest customer and former owner. On May 16, 2018, the same day that Wells Fargo declared Bristol to be in default, JCI told Bristol it would provide $3 million in cash to Bristol. Two weeks later, on June 1, 2018, JCI increased its cash injection amount to $3.5 million. In response, on the same day, Wells Fargo agreed not to act on its notice of default. Also on June 1, 2018, JCI and Bristol entered into a nonbinding Memorandum of

Understanding ("MOU") in which JCI agreed to a price increase and further agreed to invest in the development of the DHX Technology. One term of the MOU was that Bristol remain a going concern, meaning that it would continue operations and be able to meet its financial obligations. Importantly, June 1, 2018, is sixty days before July 31, 2018, and is the date on which sixty-days' notice would have been required under the WARN Act if no exception applied.

Between June 1 and July 26, 2018, Bristol had ongoing discussions with JCI about an additional investment of cash. JCI continued to indicate that it was very interested in seeing the development of the DHX Technology to completion. Bristol also worked with a broker to obtain offers to purchase its real estate through a sale-leaseback transaction. It anticipated that such a transaction would have provided $17.5 million in working capital. Additionally, it sought public financing from local government sources and approached competitors and others about a sale of the company. When Bristol's Chief Financial Officer Vicky Harrison left Bristol on July 13, 2018, she believed there would be sufficient cash flow for Bristol to continuing operating at least through the end of 2018.

On July 26, 2018, JCI indicated that it had a proposal to discuss with Bristol. Bristol believed that JCI would communicate its commitment to investing an additional $5 million, which Bristol had requested. However, during a conference call the next day, JCI told Bristol it had decided not to invest additional funds into

developing the DHX Technology and was terminating the MOU. After this conference call on Friday, July 27, 2018, Bristol's leadership decided it had no viable option but to begin winding down the company's operations, as it had no immediate access to cash with which to pay employees or purchase raw materials. Four calendar days and two business days later, it issued notice of the pending plant closure to its employees and commenced terminations.

In response to the defendants' evidence, the plaintiffs have offered evidence suggesting that Bristol's downfall was foreseeable and expected long before July 26, 2018, and that it was unreasonable for Bristol to rely on the possibility of further investment from JCI under the nonbinding MOU. The record contains evidence suggesting that Bristol anticipated AWAL's nonpayment in April 2018 and that the company's dire financial situation was apparent at that time, if not earlier. The plaintiffs contend that Wells Fargo required Garrison to convert its second lien debt to equity, which Garrison did not do, thereby preventing Bristol from obtaining refinancing. The plaintiffs further assert that Bristol did not seek new business in earnest and failed to pursue several markets that could have allowed the company to remain afloat. They also note that Bristol did not seek financing from other banks when Wells Fargo refused to lend it additional funds. Moreover, the plaintiffs argue that the $5 million Bristol sought from JCI would have been insufficient to avoid the plant closure because that money would have been designated specifically for

development of the DHX Technology and could not have been used to meet other obligations. In essence, the plaintiffs have put forth evidence from which a factfinder could conclude that (1) Bristol's fate was inevitable long before it ultimately gave notice on July 31, 2018, rendering the unexpected business circumstances exception inapplicable, and (2) Bristol failed to pursue avenues that could have allowed it to save the company, thus precluding its reliance on the faltering business exception.

The WARN Act prohibits certain employers from ordering a plant closing or mass layoff unless each employee who suffers an employment loss is provided sixty days' advance written notice of the mass layoff or plant closing. 29 U.S.C. § 2102; *United Food & Commercial Workers Union Local 751*, 517 U.S. at 545–46. Employers who violate the Act are liable to each affected employee for the following:

> (A) back pay for each day of violation at a rate of compensation not less than the higher of --
>
>> (i) the average regular rate received by such employee during the last 3 years of the employee's employment; or
>>
>> (ii) the final regular rate received by such employee; and
>
> (B) benefits under an employee benefit plan described in section 1002(3) of this title, including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

29 U.S.C. § 2104(a)(1). The employer is also subject to a civil penalty of not more than $500 per day of violation. 29 U.S.C. § 2104(a)(3). The employer is liable for the period of the violation, up to a maximum of sixty days, but no more than one-half the number of days an employee was employed by the employer. 29 U.S.C. § 2104(a)(1).

The WARN Act contains several exceptions to the sixty-day notice requirement, however. One exception is for closures "caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." § 2102(b)(2)(A). "An employer relying on this subsection shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C.A. § 2102(b)(3).

A Department of Labor regulation provides that business circumstances are "not reasonably foreseeable" if they are "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control." 20 C.F.R. § 639.9 (b)(1). For example,

> A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable. A government ordered closing of an employment site that occurs without prior notice also may be an unforeseeable business circumstance.

*Id.* The regulation further explains,

The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services.

20 C.F.R. § 639.9(b)(2). "To satisfy these conditions, the defending party must establish that (1) the circumstance was unforeseeable, and (2) the layoffs were caused by that circumstance." *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009). "When confronted with an assertion that the exception applies, a reviewing court must be careful to avoid analysis by hindsight; the trail of harbingers of an unforeseen event always looks brighter in retrospect." *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 641 (4th Cir. 1997). "[A] company will be excused from WARN liability if, when confronted with potentially devastating occurrences, it reacts as would reasonable employers within its own market." *Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1061 (8th Cir. 1996).

Another exception to the sixty-day notice requirement applies

if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

29 U.S.C. § 2102(b)(1). This exception is known as the faltering company exception. In this scenario, too, an employer must give as much notice as is practicable. To avail itself of this exception,

(1) An employer must have been actively seeking capital or business at the time that 60-day notice would have been required. That is, the employer must have been seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method. The employer must be able to identify specific actions taken to obtain capital or business.

(2) There must have been a realistic opportunity to obtain the financing or business sought.

(3) The financing or business sought must have been sufficient, if obtained, to have enabled the employer to avoid or postpone the shutdown. The employer must be able to objectively demonstrate that the amount of capital or the volume of new business sought would have enabled the employer to keep the facility, operating unit, or site open for a reasonable period of time.

(4) The employer reasonably and in good faith must have believed that giving the required notice would have precluded the employer from obtaining the needed capital or business. The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close. This condition may be satisfied if the employer can show that the financing or business source would not choose to do business with a troubled company or with a company whose workforce would be looking for other jobs. The actions of an employer relying on the "faltering company" exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.

20 C.F.R. § 639.9(a).

"Because the WARN Act is remedial legislation, its exceptions are construed narrowly." *Local Union 7107*, 124 F.3d at 640. "Moreover, an employer relying on an exception bears the burden of persuasion." *Id.* at 641.

Based on my review of the record evidence, I conclude that deciding whether either invoked exception applies in this case will require the resolution of factual disputes and credibility determinations. Summary judgment is therefore inappropriate. I will deny the defendants' motion regarding the unexpected business circumstances and faltering company exceptions of the WARN Act.

III.

For the reasons given, it is hereby **ORDERED** as follows:

1. Defendants' Joint Motion for Partial Summary Judgment as to Plaintiffs' Demand for Severance Damages Under the WARN Act, ECF No. 28, is GRANTED;

2. Defendants' Joint Motion for Partial Summary Judgment as to Liability for Subclass Two Plaintiffs, ECF No. 61, is GRANTED;

3. Subclass Two, as described in the court's earlier class certification order, ECF No. 32, is abolished, and an amended class certification order is forthcoming;

4. Defendants' Joint Motion for Partial Summary Judgment as to Certain Employees in Subclass Three that Received at Least 60 Days Notice of the Plant Closing Prior to Their Termination, ECF No. 63, is DENIED without prejudice;

5. Plaintiffs' Motion for Voluntary Dismissal of Defendant Garrison Investment Group, LP, ECF No. 86, is GRANTED;

6. Garrison Investment Group, LP, is DISMISSED WITHOUT PREJUDICE, and the Clerk shall terminate that defendant as a party;

7. Defendant Garrison Investment Group, LP's Motion for Summary Judgment as to Liability Under a "Single Employer" Theory, ECF No. 65, is DENIED AS MOOT; and

8. Defendants' Joint Motion for Partial Summary Judgment as to the Unexpected Business Circumstances and Faltering Company Exceptions of the WARN Act, ECF No. 67, is DENIED.

ENTER: March 26, 2020

/s/ *JAMES P. JONES*
United States District Judge